RICHARD L. CLEASBY, APPELLANT AND CROSS-APPELLEE, V. LEO A. DALY COMPANY, APPELLEE AND CROSS-APPELLANT.

376 N.W.2d 312

Filed November 15, 1985.　No. 84-357.

David J. Lanphier and Robert M. Gonderinger of McGill, Koley, Parsonage & Lanphier, P.C., for appellant.

Martin A. Cannon of Matthews & Cannon, P.C., for appellee.

KRIVOSHA, C.J., WHITE, and HASTINGS, JJ., and CHEUVRONT, D.J., and COLWELL, D.J., Retired.

COLWELL, D.J., Retired.

This is a damage suit for breach of a contract for overseas personal services brought by Richard L. Cleasby against his employer, Leo A. Daly Company (Daly). A jury awarded Cleasby $5,346; he appeals. Daly cross-appeals, claiming as error the denial of its motion for directed verdict.

Daly is an international architectural consulting firm based in Omaha, Nebraska. In 1981 the Saudi Arabian National Guard contracted with a French firm, Dumez, to design and build a new city for about 40,000 personnel and related families, costing $972 million. Saudi Consulting House (SCH), a governmental agency having an architectural license available only to citizens, contracted with the National Guard to supervise construction and design. SCH contracted with Daly, as an associate, to perform those duties, with Daly as the major performer; SCH and the National Guard reserved some controls, and, generally, their wishes were respected. Daly was required to provide for approval a list of all permanent personnel and their job assignments, which included Cleasby. Approval of replacements was also required. Except for vacation time, all assigned personnel were required to be working full time at the jobsite. Temporary absences were approved informally.

In April 1981 Daly solicited Cleasby's services as project manager—Cleasby had an established work background in the field of personnel management—he accepted the offer contained in a four-page letter dated May 15, 1981. The first page provides:

This letter is a confirmation of our understanding with

you in regard to your joining the staff of LEO A. DALY and being assigned to the National Guard Housing Project at Khashm-Al-An near Riyadh, Saudi Arabia. This specific assignment is for a two-year period, but it is hoped that by mutual agreement between you and our firm that your association with us will be extended either in Riyadh or in another location.

Our office in Riyadh is known as SAUDI CONSULTING HOUSE - LEO A. DALY (SCH/LAD), A PROFESSIONAL ASSOCIATION. This is an association between LEO A. DALY and SAUDI CONSULTING HOUSE, a consulting engineering organization owned by the Saudi Arabian government. For purposes of administration all of our personnel assigned to Saudi Arabia are accountable to the General Manager for Leo A. Daly affairs in Saudi Arabia, Mr. Roy L. Follmuth.

The position offered to you is for Project Manager. The work schedule will be 48 hours per week.

Salary

The compensation for this position is as follows:

| | | |
|---|---|---|
| Salary | US$ 54,000 | per annum (effect. 29 Aug '81) |
| + Completion Bonus of 15% of Total Salary | 8,100 | per annum (payable upon completion of 24 months employment) |
| Total | US$ 62,100 | per annum |

Following page 1 are general benefits and requirements including automatic banking of paychecks, free living accommodations, paid travel and shipment of personal property, paid stateside storage of household goods, insurance and medical benefits including evacuation to and treatment in

London for major illness, furnished auto, profit-sharing plan, income tax benefits (foreign), immigration procedures, and a physical examination requirement. Also included:

### Vacation and Rest and Recreation (R&R)

Regarding vacation and recreation leave (R&R), after 12 months we provide four weeks leave, together with a round-trip economy air fare to the point of origin; R&R leave of one week together with round-trip air fare to London (or equivalent) following 6 and 18 months on the job. . . .

### Force Majeure

We must, of necessity, reserve the right to interrupt or discontinue overseas assignments upon the occurrence of unforeseen or unexpected conditions such as termination of the Client's project, war, incurrection [sic], and the like.

In directing its overseas promotional efforts, LEO A. DALY is careful to consider the implications of work performance in foreign locations. Conditions affecting admission, language, customs, accommodation, travel, food, health, and personal safety are among the factors regularly evaluated.

The 2-year term began August 29, 1981. It is noted that the written contract provided employment for Cleasby on the staff of Daly as well as a special assignment overseas, and the evidence shows that Daly honored the staff employment.

For technical reasons Cleasby signed the contract after arrival in Saudi Arabia, backdating it to May 16, 1981, as instructed. Prior to August 29 Cleasby acquainted himself with the project and his duties, including a trip to Saudi Arabia. Cleasby described his duties as the supervisor of all construction inspectors and technicians, on behalf of the National Guard, to ensure contract compliance. Daly had about 35 persons on the job. All parties agree that the project manager was a key position imposing much responsibility for the day-to-day operation and success of the entire project and Daly's performance of its agreement with SCH. The job required personal performance.

Cleasby performed his assigned duties without reported incident or complaint until April 9, 1982, when he took R and R

to Greece, where he suffered a gastrointestinal ailment. This was followed by treatment in London, England, until May 28, 1982, when he was returned to Omaha, Nebraska. His recovery was not completed until July 6, 1982, when Dr. Joseph Holthaus released him to return to his duties.

When Cleasby left on R and R, his duties were temporarily assumed by a Daly employee, Errol Dierks. Due to Cleasby's illness, Daly hurriedly dispatched an Omaha employee, Scott Rynearson, to temporarily assume the project manager duties. Since he was one of the original planners, he had a full understanding of the project. Upon the further-delayed recovery, Rynearson's satisfactory performance, and the need for an onsite manager, arrangements were made with SCH to approve Rynearson as the permanent project manager, which, after some delay, was finalized on August 16, 1982.

About June 28, 1982, Cleasby conferred with his immediate superior, Vice President Robert Ramsey, concerning his job status. Ramsey told him that he was discharged and that he would not be returning to Saudi Arabia, giving as reasons that he had been away a long time, everybody was extremely pleased with Rynearson's performance, and it would be inappropriate to replace Rynearson. On July 6, 1982, Cleasby conferred with John Free, senior vice president, who told him that he was not discharged but that he would not be returned to his job and that they would find a place for him in their organization. On July 16, 1982, there was a further discussion with both Ramsey and Free; he was again told that he would not be returned to Saudi Arabia, the previous reasons were again discussed, and, in addition, administrative and personnel problems and unsatisfactory job performance were suggested as other reasons. Particularly, Cleasby was told that his return required the approval and consent of Dr. Nassif, resident manager of SCH, who would not be available for consultation until about September 15, 1982. There was some evidence that a request had been made for a visa permitting Cleasby to return to Saudi Arabia.

There were no further business contacts with Daly. Cleasby's overseas salary was restored, but he was not required to perform any work. About September 20 Cleasby had his attorney contact Daly again, requesting reassignment as project

manager and suggesting that otherwise some legal action would be taken. Daly responded by letter of October 13, 1982, discharging Cleasby effective September 25, 1982. This suit followed.

Cleasby's main theory of recovery is that he performed a fully integrated contract, and since there were no express provisions for termination, Daly was without authority to do so. Cleasby claims the measure of damages is the amount of the unpaid salary for the balance of the contract term, including bonuses and special damages, citing *Sullivan v. David City Bank*, 181 Neb. 395, 148 N.W.2d 844 (1967). He assigns as error (1) the ruling of the trial court that the contract was not fully integrated and that there was an implied right of Daly to terminate the contract upon good cause shown, (2) the court's instructions on plaintiff's burden of proof and damages, and (3) the ruling of the court that the Nebraska Wage Payment and Collection Act, Neb. Rev. Stat. §§ 48-1228 et seq. (Reissue 1984), was inapplicable. Cleasby's petition alleges the written contract, Daly's refusal to return him to Saudi Arabia on July 16, 1982, performance, wrongful discharge by Daly on September 25, 1982, and damages.

Daly's defenses are that Cleasby failed to meet his burden of proof; that there were implied provisions and conditions to the contract that were violated by Cleasby, including his required personal presence at the jobsite, except for annual leave, R and R, and temporary absences; that Daly had a right to terminate the contract because of Cleasby's extended absence from the jobsite; and that there was a right to terminate the contract because of business necessity.

There is confusion in the record concerning the date that Cleasby's 2-year employment contract was terminated. Cleasby claims September 25, 1982, and Daly claims July 16, 1982.

"The refusal of an employer to allow an employee to perform the duties required of him by his employment amounts to his dismissal from such employment." (Syllabus of the court.) *Schlueter v. School Dist. No. 42*, 168 Neb. 443, 96 N.W.2d 203 (1959).

Cleasby's petition alleges that Daly refused to return him to the jobsite on July 16, 1982, which is fully supported in the evidence. The written employment contract was terminated on

July 16, 1982, and the jury should have been so instructed.

Whether the contract between Daly and Cleasby was fully integrated is discussed first. The following three tests are appropriately applied to determine if a transaction has been completely integrated: (1) Was the contract complete; did it include the whole or only a part of the transaction? (2) Does the evidence outside the writing vary or controvert the written terms? (3) Was the writing intended to cover the whole transaction, as shown by the conduct and language of the parties and the surrounding circumstances? In answering these questions, sometimes the court will have to look no further than the instrument itself. The court, not the jury, decides as a preliminary matter the extent to which a transaction is embodied in the writing. *Traudt v. Nebraska P.P. Dist.*, 197 Neb. 765, 251 N.W.2d 148 (1977).

From a reading of the contract the greater part relates to employee benefits without reference to his duties, responsibilities, or required performance. There are no provisions for job description, level of performance and job review, discharge and termination rights of either party, rights of the parties in the event of unforeseen absences from the jobsite (an issue here), or inability to perform the contract except as provided in the force majeure provisions.

The lack of such important provisions in the writing indicates that the contract was not complete; it clearly described only a part of the agreement. From an examination of the contract alone, it is apparent that the transaction was not completely integrated. In addition, the evidence at trial did not vary the written terms. Finally, the conduct of the parties, specifically that of Cleasby in his performance of work on the jobsite in Saudi Arabia, indicates that the parties intended there to be more to the contract than was embodied in the writing.

None of the three *Traudt* tests are met. The trial court properly ruled early in the evidence that the contract was not fully integrated, and it was implied that each party had the right to terminate it for cause. See *McIntyre v. Plywood Company*, 24 Wash. App. 120, 600 P.2d 619 (1979).

> The policy of the law is to supply in contracts what is presumed to have been inadvertently omitted or to have been deemed perfectly obvious by the parties . . . .

[W]hatever may fairly be implied from the terms or nature of an instrument is, in the eyes of the law, contained in it.

17 Am. Jur. 2d *Contracts* § 255 at 649 (1964).

We next discuss Daly's cross-appeal and claim of error, the denial of its motion for directed verdict made at the close of the evidence based on (1) Cleasby's failure of proof and (2) justification for termination because of business necessity.

A motion for a directed verdict must, for the purpose of decision thereon, be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed. Such party is entitled to have every controverted fact resolved in his favor and to have the benefit of every inference that can reasonably be deduced from the evidence. Where, however, the facts adduced to sustain an issue are such that reasonable minds can draw but one conclusion therefrom, it is the duty of the court to decide the question as a matter of law rather than to submit it to a jury for determination.

*Hoefer v. Marinan*, 195 Neb. 477, 480, 238 N.W.2d 900, 903 (1976).

Daly's answer denied Cleasby's petition and alleged the defense that

plaintiff became ill in April of 1982 while on leave, and continued to be ill and allegedly unable to perform his contract for at least three months, and the substantial requirements of defendant's contracts in Saudi Arabia made it imperative that a project manager be placed permanently in plaintiff's former station soon after plaintiff suffered his illness, and plaintiff was therefore replaced for reasons of *business necessity*, and plaintiff's employment contract for service in Saudi Arabia was terminated.

(Emphasis supplied.)

The answer raises two separate proof issues: (1) Cleasby had the burden to prove his performance of the contract, Neb. Rev. Stat. § 25-836 (Reissue 1979), and *Timmerman v. Hertz*, 195 Neb. 237, 238 N.W.2d 220 (1976); and (2) Daly had the burden to prove justification because of business necessity.

The annotation in 21 A.L.R.2d 1247 at 1249 (1952) states:

Whether or not the facts present a situation which justifies

the discharge of the employee is usually a question for the jury.

The courts have stated that among the factors to be considered are the duration and nature of the illness or incapacity, the term of the contract of employment, the type of services to be rendered, the necessities of the employer, and whether the services may be reasonably and substantially performed for a time by another.

In a personal service contract there is an implied condition that the employee will be able to perform at the time stipulated for performance. And some courts have said generally that where a contract of employment is not absolute, the inability of the employee to perform services due to sickness or other disability discharges both parties from further performance.

See, also, 18 S. Williston, A Treatise on the Law of Contracts § 1942 (3d ed. 1978).

There is a conflict in the evidence as to whether Cleasby performed all of the contract terms as required, so that issue was properly a fact question for the jury.

Daly's affirmative defense of business necessity as justification for terminating Cleasby's 2-year employment in Saudi Arabia is discussed next. That defense is included in instruction No. 9, considered at the jury instruction conference. Daly filed 15 requested instructions that were refused by the court; however, they are not included in the record here.

Business necessity is sometimes called impossibility of performance, extreme impracticability, frustration of contract, or implied condition in the promise. That defense has as a foundation the supervening impossibility caused by the unforeseen illness and extended recovery time, absent fault, the employer's unusual necessities to replace, and compliance with foreign administrative rules. It is fully discussed in Annot., 84 A.L.R.2d 12 at 50 (1962): "The theory that under some circumstances the contract, although absolute in terms, should be read as if it contained an excusing condition relative to the contingency which developed has been rather widely adopted . . . ."

Daly presented evidence concerning the necessity of having

its employees who were to work in Saudi Arabia be approved by the Saudi Arabians and that Daly was not free to replace personnel at will. Evidence was also presented that the Saudi Arabians usually approved whomever Daly proposed. While the circumstances of Daly's not being entirely free to return Cleasby to Saudi Arabia may have been a factor in its decision to replace Cleasby with Rynearson, under the facts it does not rise to the level of impossibility due to foreign law that is an excuse for breach of contract. See 18 S. Williston, *supra* § 1938.

The Restatement (Second) of Contracts § 261 at 313 (1981), states:

> § 261. Discharge by Supervening Impracticability
>
> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

Further, the Restatement, *supra* § 265 at 334-35, states:

> § 265. Discharge by Supervening Frustration
>
> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

The evidence concerning Cleasby's illness and absence strongly supports Daly's affirmative defense of business necessity. In addition, the evidence that performance was urgently required in Saudi Arabia, that there was a need for a manager currently informed of all developments and problems, and that there was an ongoing need to promote and maintain acceptable administrative relationships with SCH and the National Guard also supports the defense of business necessity. Lastly, there is the uncontroverted and convincing evidence that Daly was required to obtain approval of replacements, that Cleasby was barred from returning to Saudi Arabia without the express consent of a certain Dr. Nassif, and that his consent could not have been obtained before September 15.

A mere scintilla of evidence is not enough to require the submission of an issue to the jury. *Langemeier, Inc. v. Pendgraft*, 178 Neb. 250, 132 N.W.2d 880 (1965). The evidence on the issue of justification because of business necessity is undisputed and conclusive in favor of Daly, and reasonable minds could draw but one conclusion, that Daly was justified as a matter of law because of business necessity to terminate Cleasby's 2-year employment in Saudi Arabia on July 16, 1982.

Even so, Daly's motion for a directed verdict was properly denied, since the pleadings and the evidence present other issues for trial, including damages for unpaid compensation due before and after July 16, 1982, and for consequential damages.

The jury should have been instructed that Daly's termination of Cleasby's employment in Saudi Arabia was without fault and justified, whether or not such was requested by Daly. *Enyeart v. Swartz*, 213 Neb. 732, 331 N.W.2d 513 (1983). Failure to do so was prejudicial error. The judgment is set aside, and the cause is remanded for trial on all remaining issues.

It is not necessary to discuss the other assigned errors.

Since upon remand plaintiff may again present the issue of attorney fees under the Nebraska Wage Payment and Collection Act, §§ 48-1228 et seq., it is noted that this is a special statutory remedy for the recovery of unpaid wages. *Rudolf v. Tombstone Pizza Corp.*, 214 Neb. 276, 333 N.W.2d 673 (1983). The cause of action stated here is a suit to recover damages for breach of contract, so the provisions of the Nebraska Wage Payment and Collection Act do not apply.

REVERSED AND REMANDED WITH DIRECTIONS.

CHEUVRONT, D.J., dissenting.

I agree that the employment contract between Daly and Cleasby was not fully integrated; I further agree that the Nebraska Wage Payment and Collection Act does not apply.

I respectfully dissent from that portion of the majority opinion which states: "The evidence on the issue of justification because of business necessity is undisputed and conclusive in favor of Daly . . . ." In my opinion the record in this case does not support such a conclusion. Rather, a factual question did exist which was for the jury to decide. Even Daly's own employees gave conflicting reasons for the discharge. I would affirm.